United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIELLE G.,

    Plaintiff,

v.

ANDREW M. SAUL,

    Defendant.

Case No. 18-cv-06860-JSC

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 17

Plaintiff Danielle G. seeks social security disability benefits for physical and mental impairments caused by Borrelia Hermsii (a tick-borne illness), including paralysis in the hands and feet, vision problems, neurological issues, rapid heart rate, and low cortisol. (Administrative Record ("AR") 265.) Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her application for benefits. (Dkt. No. 1.)[1] Now before the Court are Plaintiff's and Defendant's motions for summary judgment.[2] (Dkt. Nos. 16 & 17.) Because the decision of the Administrative Law Judge ("ALJ") to deny benefits is supported by substantial evidence and free of legal error, the Court DENIES Plaintiff's motion and GRANTS Defendant's cross-motion.

**LEGAL STANDARD**

A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[1] Record citations outside of the administrative record are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 8 & 9.)

1 result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is engaging in "substantial gainful activity"; (2) whether the claimant has a severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual function capacity" ("RFC") the claimant can still do her "past relevant work"' and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 CFR §§404.1520(a), 416.920(a).

An ALJ's "decision to deny benefits will only be disturbed if it is not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks and citation omitted). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.* In other words, if the record "can reasonably support either affirming or reversing, the reviewing court may not substitute its judgment for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation marks and citation omitted). However, "a decision supported by substantial evidence will still be set aside if the ALJ does not apply proper legal standards." *Id.*

## BACKGROUND

### I. Procedural History

Plaintiff filed a Title II application for social security disability benefits and a Title XVI application for supplemental security income in January 2015. (AR 233, 240.) The Commissioner first denied Plaintiff's applications in August 2015, (AR 180), and again denied the

1    applications upon reconsideration in January 2016, (AR 194, 200). Plaintiff then filed a request
2    for a hearing before an ALJ. (AR 211.) On July 7, 2017, Plaintiff testified before ALJ Robert
3    Freedman. (AR 35-115.) Plaintiff's counsel was present at the hearing, and Vocational Expert
4    ("VE") Darlene McQuary and Plaintiff's mother also testified. (AR 35.)

The ALJ issued Plaintiff an unfavorable decision in November 2017. (AR 12.) The decision became final in September 2018 after the Appeals Council denied Plaintiff's request for review. (AR 1.) Plaintiff filed this action thereafter. (Dkt. No. 1.)

## II. Administrative Record

Plaintiff was born on May 29, 1978 and resides in Salinas, California. (AR 233.) She asserts that she has been unable to work since October 14, 2013 due to physical and mental impairments caused by Borrelia Hermsii, which she contracted after being bitten by a tick in mid-2013. (*See* AR 265.) Plaintiff previously worked as a job placement counselor in 2013, a retail store manager from 2008 to 2010, a reservation agent from 2004 to 2005, and a sales representative from 2003 to 2004. (AR 266.)

### A. Medical Evaluations and Physician Statements

#### 1. Opinions of Treating Physician Dr. Wright

Dr. D. Craig Wright has been Plaintiff's treating physician since 2014. (*See* AR 940.) Dr. Wright submitted a medical source statement in August 2015, assessing Plaintiff with chronic fatigue and painful paresthesia in her "hands, arms, and feet." (AR 850.) Dr. Wright opined that Plaintiff could carry and lift less than 10 pounds; stand or walk for 30 minutes with a walker, and sit for a total of one hour in an eight-hour workday; occasionally reach, handle, finger, feel, balance, stoop, kneel, and crouch; and never climb or crawl. (AR 850-51.) Dr. Wright opined that Plaintiff's prognosis was "poor." (AR 851.)

Dr. Wright submitted another medical source statement in June 2017, assessing Plaintiff with Borrelia Hermsii infection; tick-borne relapsing fever (TBRF); tick-borne illness; chronic fatigue syndrome; chronic pain syndrome; and orthostatic hypertension with postural tachycardia. (AR 940.) Dr. Wright opined that Plaintiff's prognosis had improved since 2014, but she "ha[d] not returned to normal after her infection." (*Id.*) As for work-related limitations, Dr. Wright

3

opined that Plaintiff's symptoms would cause frequent interference "with the attention and concentration required to perform simple work-related tasks." (AR 941.) Dr. Wright further opined that Plaintiff: can sit for 50 minutes at a time for a total of eight hours, stand for one hour, and walk for 25 minutes at a time for a total of one hour in an eight-hour workday; must elevate her legs 45 degrees for 50% of an eight-hour workday; requires a walker to ambulate due to pain and imbalance; can grasp bilaterally 50%, and push, pull, and perform fine manipulation bilaterally 5% of an eight-hour workday; can occasionally lift and carry up to 10 pounds; can occasionally bend, crawl, and reach above shoulder level but never squat or climb; is mildly restricted from exposure to marked temperature and humidity changes; is mildly restricted from driving; requires unscheduled 15 minute breaks every two hours; will miss five days of work per month and be off-task 20% during the workday. (AR 941-45.) Dr. Wright noted that Plaintiff is a recovering alcoholic and "[a]lcohol has been a contributory factor" to Plaintiff's medical issues "in the past." (AR 945.)

### 2. Physical Examination and Opinion by Dr. Hernandez

Dr. Manuel Hernandez is a consultative examining physician who met with Plaintiff on June 13, 2015. (AR 839.) Dr. Hernandez's report notes that Plaintiff's chief complaint was a "[h]istory of exposure to tick-borne disease with 'neurological issues.'" (*Id.*) Plaintiff reported "trouble walking, maintaining stability, eye hand coordination, [and] memory loss." (*Id.*) Plaintiff also reported "trouble with 'any real physical activities,'" but stated that "[s]he is able to accomplish her activities of daily living" and "dress, shower, [and] bathe." (*Id.*) Dr. Hernandez noted that Plaintiff "appear[ed] in no apparent distress," walked "without difficulty," and was "able to get on and off the exam table without difficulty." (AR 841.)

Dr. Hernandez reported normal findings on physical examination and found Plaintiff "alert and cooperative" with normal affect, attention, and concentration. (*Id.*) Plaintiff had full range of motion in all joints, her gait was "within normal limits," she could "balance on her toes," she did not require an assistive device, and she exhibited good muscle tone and full motor strength in all extremities with the exception of reduced grip strength in her hands. (AR 842-43.) Dr. Hernandez found, however, that Plaintiff could not balance well on her heals and could "perform tandem gait

slowly." (AR 842.) Dr. Hernandez diagnosed Plaintiff with "[h]istory of possible tick-borne disease, specifically Borrelia hermsii, which appears stable." (AR 843.) Dr. Hernandez characterized the physical examination results as "benign." (*Id.*)

Dr. Hernandez's "functional capacity assessment" opined that Plaintiff had no limitations "with regards to lifting, carrying, standing, walking or sitting positions." (*Id.*) Dr. Hernandez also found "no push or pull limitations," "no postural limitations," "no visual or communicative restrictions," and "[n]o workplace environmental limitations." (*Id.*) The only limitations noted were "manipulative limitations" due to bilateral hand weakness. (*Id.*)

### 3. Psychological Examination and Opinion by Dr. Phillips

Dr. Theresa L. Phillips is a consultative examining psychologist who saw Plaintiff on July 11, 2015. (AR 844-49.) Plaintiff reported no history of prior mental health treatment or psychological stressors but reported "physical limitations due to medical problems" associated with Borrelia Hermsii. (AR 844-45.) As for her activities of daily living, Plaintiff reported: "She is dependent for basic [activities of daily living] on her mom. She can prepare meals. She cannot take a bus without supervision. She is unable to make change and shop at the store with a list. She can dress and take a shower." (AR 845.) Plaintiff further reported that she "typically spends her day watching TV, doing household chores, and visit[ing] with her family and friends." (*Id.*)

On examination Plaintiff appeared "well groomed with good hygiene," displayed a "positive" attitude, intact motor activity, good eye contact, coherent speech, normal intelligence, unimpaired concentration and calculation, good judgment and insight, linear and logical thought process, and was alert and oriented to "date, place, time, and situation." (AR 845-46.) Plaintiff also displayed impaired concentration and memory and an anxious and tearful mood. (AR 846.) On testing, however, Plaintiff demonstrated a normal range of cognitive functioning. (AR 846-47.) Dr. Phillips diagnosed Plaintiff with an "unspecified neurocognitive disorder," and opined that Plaintiff's prognosis was "[f]air with continued medical services" and compliance with medication. (AR 848.) Dr. Phillips found no work-related mental limitations except for mild impairment with Plaintiff's "[a]bility to adapt to changes, hazards, or stressors" in the workplace. (*Id.*)

5

### 4. Non-Examining State Agency Physicians

In August 2015, non-examining state agency physicians reviewed Plaintiff's medical records, the medical opinion evidence, and Plaintiff statements, and determined that her condition did "not result in significant limitations in [her] ability to perform basic work activities" and was "not severe enough to be considered disabling." (AR 133, 150.) Two different state agency physicians made the same determination upon reconsideration of Plaintiff's applications in December 2015 and January 2016. (*See* AR 165, 177.)

### B. The ALJ's Decision

On November 22, 2017, the ALJ issued a written decision denying Plaintiff's application and finding that she was not disabled within the meaning of the Social Security Act based on the testimony, evidence, and the Social Security Administration's five-step sequential evaluation process for determining disability. (AR 15-28.)

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since October 14, 2013. (AR 17.) At step two, the ALJ determined that Plaintiff's Borrelia Hermsii constitutes a severe impairment, and her alcoholism and anxiety were non-severe. (AR 18-19.) The ALJ determined at the third step that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).)

Before reaching step four, the ALJ determined that Plaintiff "has the residual functional capacity to perform the full range of sedentary work" as defined under 20 C.F.R. §§ 404.1567(a) and 416.967(a).[3] In making his RFC determination, the ALJ found that Plaintiff's "medically

---

[3] The Commissioner defines "sedentary work" as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a). The Commissioner's interpretive guidance states that "'sedentary work' represents a significantly restricted range of work," and "[i]ndividuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96-9p, 1996 WL 374185, at *3 (1996). In addition to lifting and carrying 10 pounds at a time, the ability to perform the full range of sedentary work generally requires the

determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 22.) The ALJ cited in support of this finding Plaintiff's treatment records, her reported activities of daily living, and the medical opinion evidence. (AR 22-26.)

As for the medical opinion evidence regarding Plaintiff's physical limitations, the ALJ afforded "significant weight" to Dr. Hernandez's June 2015 opinion. (AR 24.) The ALJ found that Dr. Hernandez's opinion was "consistent with and generally well supported by the record as a whole" because Dr. Hernandez personally observed and examined Plaintiff and made findings that were "congruent with [Plaintiff's] demonstrably unremarkable physical limitations." (AR 24.) The ALJ afforded "partial weight to the physical assessments of the State agency medical consultants at initial review and reconsideration," finding that "even though they accurately account for [Plaintiff's] generally mild or otherwise unremarkable consultative and other physical examinations, they nonetheless fail to consider her exertional limitations in relation to her neurological weaknesses and resultant impaired functioning." (AR 23-24.) The ALJ afforded "little weight" to the August 2015 and June 2017 opinions of Plaintiff's treating physician Dr. Wright, finding that neither opinion was consistent with the objective medical evidence because they both grossly overstated Plaintiff's physical limitations and contradicted Dr. Wright's own treatment records. (AR 24-25.)

As for the opinion evidence regarding Plaintiff's mental limitations, the ALJ gave "great weight to the mental assessments of the State agency psychological consultants at initial review and reconsideration," finding the opinions "largely consistent with and supported by the objective findings in the record." (AR 25.) The ALJ afforded "significant weight" to Dr. Phillips's July 2015 opinion regarding Plaintiff's mental limitations because the findings aligned with Plaintiff's "mild mental limitations as noted in the sparse mental health treatment records." (AR 25.)

The ALJ also considered the third-party statements from Plaintiff's mother and afforded

---

ability to walk or stand for a total of "no more than about 2 hours," and sit for a total of "about 6 hours of an 8-hour workday." *Id.*

7

them "little weight." (AR 25-26.) The ALJ determined that the statements were not (1) consistent with the medical opinion evidence or treatment records, (2) accurate as to any "medical signs or symptoms," and (3) unbiased by virtue of the familial relationship. (*Id.*)

At step four, the ALJ cited the VE's hearing testimony and concluded that Plaintiff cannot perform her "past relevant work as job developer, retail store manager, sales representative, and reservation agent." (AR 26.) Finally, the ALJ determined at step five that Plaintiff could perform other work "that exists in significant numbers in the national economy" based on her "age, education, work experience," and RFC to perform the full range of sedentary work. (AR 27.) In sum, the ALJ determined that Plaintiff was not "under a disability, as defined in the Social Security Act, from October 14, 2013, through the date of [the ALJ's] decision." (AR 27.)

**DISCUSSION**

The parties dispute whether the ALJ properly weighed: (1) the medical opinion evidence; (2) Plaintiff's subjective symptom testimony; and (3) third-party statements from Plaintiff's mother. The Court addresses each argument in turn.

**I.    Medical Opinion Evidence**

**A.    Legal Standard**

In assessing an ALJ's consideration of the medical opinion evidence, courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examiner nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

An ALJ may reject the "uncontradicted opinion of a treating or examining doctor" only by stating "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks and citation omitted). And "[e]ven if the treating doctor's opinion is contradicted by another doctor, the

8

Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (citation omitted). That said, "[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) ("[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence.") (alterations in original). Likewise, the opinions of non-examining physicians may "serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

"The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Id.* Ultimately, "[t]he ALJ must do more than offer his conclusions" when rejecting a medical opinion; instead, she "must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Thus, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014).

### B. The ALJ's Analysis

Because the opinions of treating physician Dr. Wright were contradicted by other medical opinion evidence, the ALJ was required to provide "'specific and legitimate reasons' supported by substantial evidence in the record" for discounting Dr. Wright's opinions. *See Lester*, 81 F.3d at 830 (citation omitted). The ALJ did so.

#### 1. August 2015 Opinion

In affording little weight to Dr. Wright's August 2015 opinion, which addressed Plaintiff's

9

physical limitations, the ALJ noted that the functional limitations expressed in the opinion were inconsistent with Plaintiff's treatment records. (AR 24-(citing Exs. 1F-8F, 11F-14F).) The ALJ's determination is supported by substantial evidence; specifically, Plaintiff's treatment records and the conflicting opinions of Dr. Hernandez and the State agency physicians.

On examination in January 2014 Plaintiff reported numbness in the bilateral lower extremities and abdomen and on examination demonstrated normal strength and normal gait. (AR 426.) Dr. Wright ordered a tick-borne disease panel on January 29, 2014 after Plaintiff complained of "fatigue, dizziness, palpitations," and weight loss. (AR 509.) Dr. Wright diagnosed Plaintiff with a Borellia Hermsii infection on February 5, 2014, and examined Plaintiff 10 times between February 5 and 28, 2014, noting, in pertinent part, positive findings of fatigue; loss in vision; arthralgias; myalgias; weakness; malaise; confusion; dizziness; difficulty walking; and abnormal balance and gait. (AR 489-508, 800-819.) Beginning in late February 2014 until April 7, 2014, Plaintiff underwent an intensive course of treatment with antibiotics for her infection. (AR 603-814.)

Dr. Wright examined Plaintiff on June 9 and 16, 2014 and noted "abnormal" findings of fatigue and paresthesia in hands; all other findings—including gait and motor strength—were normal. (AR 483.) Dr. Wright next examined Plaintiff on July 7 and 17, 2014 and noted "abnormal" findings of fatigue, paresthesia of hands and feet, and anxiety. (AR 480.) Dr. Wright examined Plaintiff on July 31, 2014 and noted "abnormal" findings of fatigue and paresthesia of hands and feet. (AR 479.) Dr. Wright next examined Plaintiff on August 6, 2014 and noted "abnormal" findings of fatigue, symptoms related to bronchitis, and paresthesia in hands and feet; all other findings were normal. (AR 478.) Dr. Wright examined Plaintiff again on August 20, 2014, September 12 and 18, 2014, and October 10 and 28, 2014 and noted "abnormal" findings of fatigue and paresthesia in hands and feet. (AR 469.) Dr. Wright next examined Plaintiff on November 11, 2014 and noted the following abnormal findings: fatigue; painful paresthesia in hands and feet; and decreased hand strength. (AR 468.) Dr. Wright's treatment records from November 24, 2014 and January 8, 2015 indicate normal findings on examination. (AR 466-67.) Dr. Wright examined Plaintiff again in February 2015; his report indicates normal findings on

examination with the exception of "painful paresthesia of the hands." (AR 464.)

In April 2015, Plaintiff was the driver in a single-vehicle accident and received treatment at the Community Hospital of the Monterey Peninsula's ("Monterey Hospital") emergency room. (AR 834-38.) On examination Plaintiff exhibited normal range of motion, normal neurological and psychological functioning, and denied any complaints. (AR 836-38.) The following month, Plaintiff was in another motor vehicle accident and received emergency room treatment at the Monterey Hospital for a cervical muscle strain and left knee contusion. (AR 827-31.) Plaintiff displayed normal neurological and psychological functioning on examination, (AR 828), and normal range of motion, (AR 829).

Those findings track the opinion of Dr. Hernandez, who physically examined Plaintiff in June 2015. Dr. Hernandez's findings on examination and his medical opinion conflict with Dr. Wright's July 2015 prescription of a wheelchair for Plaintiff's abnormal gait and his August 2015 medical source statement regarding Plaintiff's physical limitations. Because the opinion of Dr. Hernandez was based on his independent clinical findings upon examination of Plaintiff, his opinion alone constitutes substantial evidence in support of the ALJ's determination. *See Andrews*, 53 F.3d at 1041. Thus, "it is then solely the province of the ALJ to resolve the conflict" between Dr. Hernandez's and Dr. Wright's respective opinions. *See id.* Accordingly, Plaintiff's arguments regarding the weight assigned to the opinions of the non-treating physicians are misplaced. (*See* Dkt. No. 16-1 at 24-26.) The Court is not required to *reweigh* the medical opinion evidence and replace its interpretation for the ALJ's; instead, the scope of the Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence and free of legal error. It is.

### 2. June 2017 Opinion

As for the weight assigned to Dr. Wright's subsequent medical source statement in June 2017, the ALJ found that it was "also inconsistent with and unsupported by the record as a whole, because it grossly overstates [Plaintiff's] functional limitations without providing adequate support for its conclusions in light of her unremarkable treatment records. (AR 25 (citing Exs. 1F-8F, 10F-13F).) The ALJ's determination is supported by substantial evidence.

11

Dr. Wright examined Plaintiff in February 2016 and noted complaints of fatigue, "difficultly walking (due to foot pain), arthralgias (arms, hands and wrists), . . . myalgias," and neurological complaints of "weakness, malaise, confusion, and dizziness." (AR 858-59.) Dr. Wright noted that Plaintiff's "[p]ainful parasthesias" had improved with medication. (AR 859.) Plaintiff again denied "anxiety, depression, feelings of stress and sleep disturbance." (*Id.*) On examination Plaintiff displayed exhibit normal neurological and psychiatric functioning with the exception of "abnormal" balance and gait. (AR 860.) Plaintiff denied "complaints of pain on range of motion testing in both hands." (*Id.*)

Dr. Wright examined Plaintiff in August 2016 and his findings track the February 2016 findings nearly verbatim. Dr. Wright again noted complaints of fatigue, "difficultly walking (due to foot pain), arthralgias (arms, hands and wrists), and myalgias." (AR 853-54.) Dr. Wright also noted neurological complaints of "weakness, malaise, confusion, and dizziness." (*Id.*) Plaintiff denied "anxiety, depression, feelings of stress and sleep disturbance." (*Id.*) On examination Plaintiff again exhibited normal neurological and psychiatric functioning with the exception of "abnormal" balance and gait. (AR 855.) Plaintiff also denied "complaints of pain on range of motion testing in both hands." (*Id.*)

In March 2016, Plaintiff began physical therapy at the Monterey Hospital. (AR 873.) The physical therapist's clinical impression noted that Plaintiff displayed "decreased balance, difficulty walking, decreased hip [range of motion], decreased strength, gait abnormality, and increased difficulty with household management and recreational activities." (AR 875.) The therapist opined that Plaintiff's prognosis was "[e]xcellent." (AR 876.) Plaintiff was reevaluated a month later and she reported that the prescribed exercises were "beneficial," but Plaintiff "still ha[d] a challenge with balance" and descending stairs, as well as "increased right outer leg numbness." (AR 878.) The therapist again opined that Plaintiff's prognosis was excellent. (AR 880.)

Plaintiff continued physical therapy and in May 2016 reported "feeling better" and "stronger." (AR 881 (internal quotation marks omitted).) The therapist noted "slow but steady progress," with "setbacks [that] would be expected from her Lyme Disease." (*Id.*) The therapist opined that Plaintiff's prognosis was excellent. (AR 882.) The following month Plaintiff reported

"increased fatigue," but the examiner noted "improved hip strength since [March 2016]," with "4/5 or greater strength throughout bilateral hips." (AR 911.) A week later Plaintiff reported that her gait was "more normal," but that she continued to have difficulties, "especially with grip strength." (AR 913.) On June 9, 2016, Plaintiff reported decreased pain due "to the start of new muscle relaxer." (AR 916.) A week later Plaintiff reported that "she [was] having a great day," and the therapist noted that Plaintiff "tolerated therapy without complaint of increased pain or weakness." (AR 918.) On June 20, 2016, Plaintiff reported that she was still feeling well, and the therapist noted that Plaintiff "tolerated therapy well and did well with balance activities although [she] still needs practice." (AR 920.) Plaintiff was discontinued from the program in July 2016 after she failed to report for treatment for over 30 days. (AR 922.)

Dr. Wright treated Plaintiff in March 2017 and his treatment note again tracks nearly verbatim the treatment notes from February and August 2016. Dr. Wright noted Plaintiff's complaints of fatigue, "difficultly walking (due to foot pain), arthralgias (arms, hands and wrists), and myalgias." (AR 931-32.) Dr. Wright also noted neurological complaints of "weakness, malaise, confusion, and dizziness." (AR 932.) Plaintiff denied "anxiety, depression, feelings of stress and sleep disturbance." (*Id.*) On examination Plaintiff again exhibited normal neurological and psychiatric functioning with the exception of "abnormal" balance and gait. (AR 933.) Plaintiff also denied "complaints of pain on range of motion testing in both hands." (*Id.*)

In June 2017 Dr. Wright submitted his medical source statement regarding Plaintiff's limitations due to her tick-borne illness. (AR 940.) Dr. Wright's exertional limitations as to Plaintiff's ability to lift/carry 10 pounds at a time, walk and stand for no more than one hour each, and sit for 8 hours in a workday track the limitations for sedentary employment. *See* SSR 96-9p, 1996 WL 374185, at *3 (noting that in addition to lifting and carrying 10 pounds at a time, the ability to perform the full range of sedentary work generally requires the ability to walk or stand for a total of "no more than about 2 hours," and sit for a total of "about 6 hours of an 8-hour workday"). Dr. Wright also opined that Plaintiff's symptoms would cause frequent interference "with the attention and concentration required to perform simple work-related tasks." (AR 941.) Dr. Wright further opined, in pertinent part, that Plaintiff must elevate her legs 45 degrees for

13

50% of an eight-hour workday; requires a walker to ambulate due to pain and imbalance; can grasp bilaterally 50%, and push, pull, and perform fine manipulation bilaterally 5% of an eight-hour workday; and will miss five days of work per month and be off-task 20% during the workday. (AR 941-45.)

As previously discussed, Dr. Wright's exertional limitations as to Plaintiff's ability to lift/carry, stand/walk, and sit align with the limitations for sedentary employment. Thus, the issue is whether substantial evidence supports the ALJ's determination that the further limitations noted in Dr. Wright's opinion are "inconsistent with and unsupported by the record as a whole, because [they] grossly overstate[ ] [Plaintiff's] functional limitations without providing adequate support." (*See* AR 25.) Because the treatment records are "susceptible to more than one rational interpretation," the ALJ's decision "must be upheld." *See Burch*, 400 F.3d at 679.

Dr. Wright examined Plaintiff three times between his 2015 opinion and 2017 opinion—February and August 2016 and March 2017. (*See* AR 853, 858, 931.) The only objective neurological and psychiatric findings noted in Dr. Wright's examination reports were "abnormal gait." (*See* AR 855, 860, 933.) Thus, there are no objective findings to support his opinion that Plaintiff's symptoms would cause frequent interference "with the attention and concentration required to perform simple work-related tasks." (AR 941.) Indeed, the ALJ noted that Dr. Phillips's July 2015 opinion, which the ALJ afforded significant weight, found only mild mental limitations on examination. (*See* AR 25.) Because Dr. Phillip's opinion was based on her independent clinical findings upon examination of Plaintiff, that opinion alone constitutes substantial evidence in support of the ALJ's determination. *See Andrews*, 53 F.3d at 1041. Thus, "it is then solely the province of the ALJ to resolve the conflict" between Dr. Phillip's and Dr. Wright's respective opinions. *See id.*

As for Plaintiff's ability to grasp and perform fine manipulation, Dr. Wright noted no issues on examination in February and August 2016. Instead, Dr. Wright noted that swelling of Plaintiff's hands had resolved, and Plaintiff had no "complaints of pain on range of motion testing in both hands." (*See* AR 855, 860, 933.) Further, none of the treatment notes state that Plaintiff required an assistive device to ambulate or contain findings to support a limitation regarding

1    Plaintiff's need to elevate her legs.  (*See id.*)

2          In sum, the ALJ's discussion of Plaintiff's treatment history, the objective medical evidence, and the conflicting opinion evidence constitute "specific and legitimate reasons supported by substantial evidence" for assigning little weight to Dr. Wright's opinions. *See Lester*, 81 F.3d at 830.  Further, it bears noting that the ALJ's RFC determination limiting Plaintiff to sedentary work "represents a significantly restricted range of work." *See* SSR 96-9p, 1996 WL 374185, at *3 ("Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations.").  In the absence of reversible error, the ALJ's decision must be upheld.  *See Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## II. Subjective Symptom Testimony

### A. Legal Standard

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted).  "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotation marks and citation omitted).

"The clear and convincing standard is the most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec.*, 278 F.3d 920, 924 (9th Cir. 2002).  Thus, the ALJ cannot rely on "general findings" in rejecting a plaintiff's subjective symptom testimony. *Holohan*, 246 F.3d at 1208.  That said, the ALJ need not accept the plaintiff's allegations of pain as true, and "may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct . . . and whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina*, 674 F.3d at 1112 (internal quotation marks and citations omitted).

Further, "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *See id.* "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* If the ALJ's assessment "is supported by substantial evidence in the record, [courts] may not engage in second-guessing." *See Thomas*, 278 F.3d at 959.

**B.  ALJ's Analysis**

Applying the two-step analysis, the ALJ first determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 22.) Because Plaintiff met the first part of the test, the ALJ was required to provide "specific, clear and convincing reasons" for rejecting Plaintiff's testimony regarding the severity of her symptoms. *Lingenfelter*, 504 F.3d at 1036. The ALJ did so.

In considering Plaintiff's subjective symptom testimony, the ALJ discussed in detail Plaintiff's function reports, her hearing testimony, and her treatment history. (*See* AR 20-23.) The ALJ found that Plaintiff's testimony regarding the "intensity, persistence, and limiting effects of [her] symptoms" were inconsistent with the medical evidence and other evidence in the record. (AR 22.) The ALJ noted that despite Plaintiff's "allegations of pain and limited functioning, the objective medical findings in the record show largely unremarkable findings and symptoms that otherwise showed improvement with treatment." (AR 22.) The ALJ then discussed the medical evidence in relation to Plaintiff's testimony, specifically noting:

> [A] computed tomography (CT) scan of the claimant's brain from January 2014 revealed negative findings (Exhibit 2F/18). By the time of her internal medicine consultative examination in June 2015, the claimant reportedly stated that [her Borrelia Hermsii infection] went into a "dormant state" and [she] denied having any fevers or history of hospitalizations (Exhibit 8F/2). At that time, the claimant reportedly admitted she was able to accomplish her activities of daily living, dress, shower, bathe, . . . and handle small instruments like scissors, screwdrivers and pliers (Exhibit 8F/2). Moreover, the claimant reportedly demonstrated no difficulty walking into the examination room or getting on or off the exam table, as well as good muscle tone, unremarkable motor strength in all extremities, and bilaterally "intact" sensation (Exhibit 8F/3-4; *see also* Exhibit 9F/1). As to claimant's gait, she reportedly displayed a gait that was within normal limits that did not require an assistive ambulatory

16

> device and she could balance on her toes, while further exhibiting a slow tandem gait and a negative Romberg test (Exhibit 8F/4). According to her physical therapy treatment records from 2016, the claimant reportedly demonstrated improved lower extremity range of motion and knee strength, decreased fatigue, and improved hip strength (Exhibit 12F/6, 12, 20, 39). By June 2017, Dr. Wright noted that the claimant's condition had improved from 2014, though she had concededly "not returned to normal after her infection" (Exhibit 14F/5). Thus, the residual functional capacity determined herein reasonably accounts for claimant's Borrelia Hermsii.

(AR 23.) These reasons are specific, clear, and convincing. Further, and as previously discussed, substantial evidence supports the ALJ's determination that Plaintiff's treatment records and the objective findings on examination do not support totally debilitating limitations associated with her condition, but instead demonstrate an ability to perform sedentary work. *See Thomas*, 278 F.3d at 959. In sum, the ALJ's assessment of Plaintiff's subjective symptom testimony is supported by substantial evidence and does not constitute reversible error.

### III. Third-Party Statements

#### A. Legal Standard

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and citations omitted). An ALJ must provide "germane reasons for discrediting the testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Inconsistency with medical evidence is one such reason." *Id.*

#### B. ALJ's Analysis

In December 2015, Plaintiff's mother provided a third-party function report in support of Plaintiff's claim for disability benefits. (AR 323.) The report details functional limitations that track Plaintiff's own function report. (*See* AR 305.) Plaintiff's mother also provided testimony at the July 2017 hearing. (*See* AR 86-92.) The ALJ's decision addressed the third-party statements and afforded them little weight, concluding that the statements failed to establish that Plaintiff was disabled. (AR 25-26.) In discounting Plaintiff's mother's statements, the ALJ noted that they, like Plaintiff's subjective symptom testimony, were "not consistent with the preponderance of the opinions and observations by medical doctors in this case." (AR 26.) That determination is

17

supported by substantial evidence for the reasons previously discussed.  Further, the ALJ's rejection of the third-party statements to the extent they were inconsistent with the medical evidence constitutes a "germane reason" for discrediting the testimony and does not evince legal error.

***

In sum, the ALJ's decision is free of legal error and the record "can reasonably support either affirming or reversing"; thus, the Court cannot "substitute its judgment for that of the Commissioner." *Gutierrez*, 740 F.3d at 523 (internal quotation marks and citation omitted).

## CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion.

**IT IS SO ORDERED.**

Dated: March 16, 2020

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge